# JANUARY TERM 1887.

JAMES LEONARDSON V. AARON HULIN ET AL.

*Equity—Bill to set aside conveyances—Agreement to make party sole
legatee—Destruction of will—Grantees with notice
of equities—Mental incompetency of grantor.*[1]

On the facts as found by the court, the decree below is affirmed.
An examination of the opinion being essential to an understanding
of the case, reference is had thereto.

Appeal from Macomb. (Stevens, J.) Argued June 24
and 25, 1886. Decided January 6, 1887.

Bill filed to set aside deeds, and for other purposes.
Defendants appeal. Decree affirmed. The facts are stated
in the opinion.

*Crocker & Hutchins,* for complainant:

The statements of a deceased person are not evidence in
behalf of his representatives, no more than in his behalf if
living: *Wilson v. Wilson,* 6 Mich. 9, 15; *Jones v. Tyler,*
Id. 364.

As to relief against deed executed by person mentally
incompetent, see *Jacox v. Jacox,* 40 Mich. 473; *Bowe v.
Bowe,* 42 Id. 195; *Duncombe v Richards,* 46 Id. 166;
*Thorn v. Thorn,* 51 Id. 167; *Allore v. Jewell,* 94 U. S. 506;
Perry, Tr. § 190.

Complainant's contract is valid in law and enforcible in
equity (*Faxton v. Faxon,* 28 Mich. 159), which court will
decree a specific performance against Hulin's heirs and
grantees (3 Parsons, Cont. 405, 406, and note; 2 Story, Eq.
Jur. § 786; Waterman, Specific Per. §§ 41, 76; *Brinker*

---

[1]For full digest of points decided, see " Table of Cases Reported."

*v. Brinker*, 7 Penn. St. 53; *Logan v. McGinnis*, 12 Id. 27; *Wright v. Tinsley*, 30 Mo. 389, 396, 399; *Gupton v. Gupton*, 47 Id. 37; *Sutton v. Hayden*, 62 Id. 101; *Davison v. Davison*, 13 N. J. Eq. 246; *Rhodes v. Rhodes*, 3 Sandf. Ch. 279; *Parsell v. Stryker*, 41 N. Y. 480; *Canada v. Canada*, 6 Cush. 15; *Jenkins v. Stetson*, 9 Allen, 128).

Where a party dies without providing by will for compensation promised to be made in that manner for services rendered, their value may be recovered against his estate: *Bayliss v. Pricture*, 24 Wis. 651; *Jilson v. Gilbert*, 26 Id. 637; *Martin v. Wright's Adm'r*, 13 Wend. 460; *Jacobson v. LeGrange's Ex'rs*, 3 Johns. 199; *Eaton v. Benton*, 2 Hill, 576; *Sword v. Keith*, 31 Mich. 247; *Robinson v. Raynor*, 28 N. Y. 494.

Anything that puts a party upon inquiry is sufficient notice: *Parker v. Kane*, 4 Wis. 1; *Lamont v. Stimson*, 5 Id. 443; *Curtis v. Mundy*, 3 Metc. 405.

The conveyances by Hulin, being a fraud on Leonardson, should be set aside, and the defendants, taking with notice, cannot be protected: *Wright v. Tinsley*, 30 Mo. 396; *Sutton v. Hayden*, 62 Id. 101, 113; *Van Dyne v. Vreeland*, 11 N. J. Eq. 370.

Hulin held the property as trustee for Leonardson, and defendants hold in the same capacity: *Hoagland v. Latourette*, 2 N. J. Eq. 254; *Force v. Dutcher*, 17 Id. 165; *Huffman v. Hummer*, Id. 263; *King v. Ruckman*, 21 Id. 599; *Haughwout v. Murphy*, 22 Id. 531; *Story v. Lord Windsor*, 2 Atk. 630; *Murray v. Ballou*, 1 Johns. Ch. 566.

Where a written agreement is accompanied with parol stipulations under circumstances which would render insisting on the writing *alone* a fraud, the complainant may claim the benefit of *both*, and the court will treat the whole transaction as resting in parol; and, in case of part performance, parol proof may be received of the whole contract or agreement, independently of the writing, in order to make out the contract: 1 Lead. Cas. Eq. (4th ed.) 1058, and cases cited; *Phyfe v. Wardell*, 2 Edw. Ch. 47; *Parkhurst v. Van Cortland*, 14 Johns. 15; *Hunt v. Rousmaniere's Adm'rs*, 1 Peters, 13, 14; *Glass v. Hulbert*, 102 Mass. 34, 35.

Parol contracts will be upheld when the party seeking relief has been put in a situation rendering it unconscionable for the other party to insist on the statute of frauds as a defense: *Lester v. Foxcroft*, Colles, P. C. 108; 1 Lead. Cas. Eq. (4th ed.) 1030, 1042; Story, Eq. Pl. §§ 761, 762, 763;

*Lamb v. Hinman,* 46 Mich. 112; Waterman, Specific Per. §§ 260, 261, and cases cited; *Franklin v. Tuckerman,* 68 Iowa, 572.

*A. S. Canfield* and *Thomas Wellman* (*Wm. T. Mitchell,* of counsel), for defendants:

Contemporaneous parol agreements cannot be set up in violation of express written contracts: *Gram v. Wasey,* 45 Mich. 223, 231; *Baker v. Morehouse,* 48 Id. 334; *Carney v. Hotchkiss,* Id. 276.

Written contracts cannot be explained by usage: *Ledyard v. Hibbard,* 48 Mich. 422; nor can a complainant seeking to enforce a contract vary, explain, or enlarge the same by parol proof, unless in cases of undoubted fraud or mistake: *Woollam v. Hearn,* 7 Ves. 211; 2 Lead. Cas. Eq. (4th ed.) 920.

As to proof of mental incompetency, see *Kempsey v. Mc-Ginniss,* 21 Mich. 123, 138.

In determining capacity, the party is to be compared with himself, not with others: *Aikin v. Weckerly,* 19 Mich. 506.

As to what is sufficient soundness, see *Fraser v. Jennison,* 42 Mich. 227–235.

It is sufficient if the mind fully or reasonably comprehends the import of the particular transaction in which the party is engaged: *Hovey v. Hobson,* 55 Me. 256; *Miller v Craig,* 36 Ill. 109; *Lozear v. Shields,* 23 N. J. Eq. 509.

The mind may be sound after memory is impaired: *Lowder v. Lowder,* 58 Ind. 538–543.

The law looks only to the competency of the understanding: *Van Alst v. Hunter,* 5 Johns. Ch. 148. See, also, 3 Am. Law Reg. 449.

MORSE, J. The original bill was filed in this cause January 26, 1880, and during the life-time of Aaron Hulin, Sr.

Aaron Hulin, Sr., died during the pendency of the suit, February 14, 1881, and thereafter, upon leave of the court, the supplemental bill was filed.

The facts in the case, as we find them, are as follows:

In the fall of 1843 the defendant Aaron Hulin, Sr., then a bachelor of the age of about 49 years, intermarried with Elizabeth Leonardson, the mother of complainant, at Ches-

terfield, in the county of Macomb.  She was a widow, with four grown-up children, and about 48 years old.  She had $300 or $400 in money, derived from her first husband's estate, who was the father of complainant.  Hulin, at the time, owned 80 acres of land in Chesterfield, and some real estate in Ohio.

Soon after the marriage, Hulin, with the money of his wife, bought 40 acres more of land in Chesterfield, taking the deed in his own name.  They moved upon it, and made their home there a few years.

Hulin had been a school-teacher all his life, teaching a great deal in the South, and some in Macomb county, making his home in Chesterfield for about 10 years before his marriage.  He commenced clearing up his land, but farming was not to his taste, and did not suit him.

Complainant at this time was a married man, about 25 years of age, and living upon a farm near Perrysburg, Ohio.

In 1844 his mother visited him, being accompanied by Hulin.  While there Hulin told complainant that he was not used to farming, and wanted him to go to Michigan and work his land.  In the latter part of that year complainant went to Michigan on a visit, and while there made a bargain or agreement, verbally, to work Hulin's land, and in February, 1845, in pursuance of such verbal arrangement, he broke up his home in Ohio, and removed with his family to Chesterfield.  When he arrived there he moved into the house with Hulin and his wife on the 40 purchased with the wife's money, and known as the Dennison 40.  There was about 15 acres cleared upon it.  Hulin then owned also an 80, known as the Cooley 80, upon which there was 35 or 40 acres cleared fit for tillage.  Hulin also had another 40, which was swampy and poor land, worth about $50.  The Dennison 40 was valued at $300, and the Cooley 80 at about $700.  There were no buildings, except a log house and barn.  Hulin's personal property consisted of a yoke of oxen, three cows, a cart, and two or three hogs.

Leonardson brought with him from Ohio his household furniture, provisions sufficient to last one year, a span of horses and wagon, and about $200 in money. About a year after he came to Chesterfield he received $150 from the estate of a cousin, and $50 from Ohio, the proceeds of his wheat crop there.

The verbal arrangement was, in substance, that Leonardson should take the lands of Hulin, and work them during Hulin's life; assume control of the whole property; improve the farm, and pay all taxes and expenses; support Hulin and his wife as long as each of them might live, in a way and manner suitable to their rank and station in life; and, in consideration of this, at Hulin's death, Leonardson was to be full and sole heir to all of Hulin's property, both real and personal.

A few weeks after Leonardson entered upon the performance of this verbal agreement, Hulin drew up a contract in accordance with such oral arrangement, and it was signed by the parties.  This contract was retained by Hulin, in his possession.  In pursuance of said agreement, and in connection therewith, about the same time, the said Hulin made and duly executed a last will and testament, in which will he devised and bequeathed to said Leonardson all his property. This will was kept in the possession of Hulin, and Leonardson was not acquainted with its contents, except that he was informed of its purport and terms by Hulin.

Relying upon this agreement and the said will, Leonardson proceeded to faithfully carry out and perform the contract upon his part, and in such a manner as to entirely suit and please Hulin, who found no fault whatever with him until after the death of Mrs. Hulin, which took place in 1876.

In the spring of 1846, 20 acres of land was bought of one Putnam Hart, and the complainant moved his family into a house upon it.  It was directly across the highway from the

Cooley 80. Hulin and wife lived upon this 80, about 100 rods from the house of Leonardson, upon the Hart place. Here both families lived for 30 years, until the death of Mrs. Hulin, when, at Hulin's request, Leonardson moved into Hulin's house, so that they might the better take care of him in his old age.

About the time of the purchase of the Hart 20, the Dennison 40 was sold to Eber Dennison, who built a new house on the Cooley 80 in payment for it.

During all these years the complainant worked these lands, and made valuable improvements upon them, in the shape of clearings, barns, sheds, fencing, and additions to the houses, and the planting of fruit trees. He labered the better part of his life-time in the supposed secure hope of recompense at the death of Hulin, and no intimation was given to him or to others by Hulin but that Hulin was satisfied, and meant to perform the agreement upon his part. Hulin repeatedly, year after year, told all the neighbors that he had willed all the property to James, the complainant. "Every bit that I have," he told Mr. and Mrs. Merriman, "has got to go to James Leonardson. No one shall ever call this (putting his hand upon his heart) a liar. I promised it to James, and James shall have it." This was in the presence and hearing of complainant and others, about two years before the filing of the bill in this cause. He said the same thing, in substance, time and time again, during the 30 years, to all with whom he conversed upon the subject, and they were many.

In 1855, or thereabouts, the real estate in Ohio was sold by Hulin for $5,500, which he put out at interest. Some of it, out upon mortgages, was not paid when due, and, by foreclosure and otherwise, he became, in the later years of his life, possessed of several pieces of land in Macomb county, and two in the county of St. Clair. These lands were not worked or controlled by Leonardson, but he assisted somewhat in the management of the money and lands acquired on ac-

count of the mortgage investment of the proceeds of the sale of the Ohio land.

In 1854, for. some reason unknown to complainant, and unexplained by the record, Hulin destroyed the written contract, but no change was made in the arrangements between the parties. In 1860 he also destroyed the will previously made by him, and executed another, a copy of which was taken by complainant,. and preserved. In this will Hulin bequeathed all his property, for her use and benefit, to his wife during her life, as his widow;—

" After which it is my choice that the same be given to James Leonardson (son of my wife), him or his heirs, providing said James continue to live with and do for me during my natural life, and do in accordance and in keeping with an article of agreement dated December 20, 1854, and signed by him and myself. But were said James to leave my premises, and not do in accordance with said article of agreement (above mentioned), then it is my wish (or will) that my property, both real and personal, be equally divided between my namesake, Aaron Hulin, son of Stephen and Catharine Hulin, and Henry Hulin, son of Jonathan and Hannah Hulin, them, their heirs, etc."

In this will he appointed James Leonardson, or his oldest heir or heiress, executor or executrix; but, in case Leonardson did not remain or fulfill the agreement, Aaron and Henry Hulin, or their oldest children, were to take such office. He also stated it to be his wish that James Leonardson, if he did not fulfill his agreement, should have $96.54 out of his property.

After the signature of himself and the witnesses he appended the following notice:

"N. B. I affirm that I will not alter the within will during the life-time of my wife, via codicil or otherwise, unless I previously inform her (my wife) that I purpose so doing.
" Thus sayeth AARON HULIN."

His wife also, at the same date, April. 21, 1860, executed her last will and testament, in which she devised to her hus-

band all her property, both real and personal, during his natural life.

"If there be aught remaining after my husband shall have done using id., it is my will and choice that it (real or personal) be given to my son, James Leonardson (or his heir or heirs)."

She appointed James her executor. In case of his death before her demise, his wife, Eleanor, was named as executrix. There was also a note to her will in which she promised not to alter or amend the same without giving notice to her husband.

Both these wills were drawn by Hulin.

The contract of December 20, 1854, referred to in Hulin's will, was made in lieu of the first contract. In 1867 he destroyed this, and wrote out another, which he and Leonardson signed. This contract is given below *verbatim et literatim,* and shows some of the peculiarities of the man:

"Nov. 25th, '67.

"We, whose names are underwritten, agree to abide by the following, viz.: Aaron Hulin agrees to allow James Leonardson to use the 20 acres bo't of Putnam Hart by A. Hulin, also the 80 acres bo't of Charles Cooley, except 10 & 51-100 acres cleared up by A. Hulin, next to J. Proper's, to use as seemeth him good on the following consideration: Hulin reserves the use dwelling now occupied by him, use of fire-wood, etc. ; as a remuneration for id., said Leonardson is to support Hulin and his family in a similar manner to which he (Hulin) was wont to live be-4 Leon came on said premises; and in addition to said remuneration or recompense said Leon is to pay such taxes that may accrue on above land so long as he may possess id., which is to continue during consent, choice, good will, &c., of the party or parties. (C other side.)

"James L. is to charge naught for such service or services as he may render in b½ of said Aaron H. & family during stay on premises.

"N. B. If either party C fit 2 quit off, it is to be done in the spring only. Tax on above land accruing in '67 to be paid by J. Leonardson. A. Hulin is to have liberty to clear up land in the premises where he may choose, & when cleared said land to belong to Hulin. And were Hulin to clear land

whereon one or more sides is already a fence, he (Hulin) is to have the use gratis of such fence for the protection of his field.

"Signed,                     ⎰ AARON HULIN.
                             ⎱ JAMES LEONARDSON.

" In a former contract (wherein cows were mentioned) date thereof was April 1st, 1845; thus sayeth

"Signed,                              AARON HULIN.

" N. B.   Also a reference to interlining which is erroneous in said copy.

" In a final settlement (the undersigned if any is necessary) no court or courts of law to be called upon, but id. is to be left to arbitrators, whose decision is to be final independent of law, but the matter left to them is to be decided according to the manner in which they understand justice, propriety, &c., aside from law or technicalities of id.

" Discharge or quitting to take place only in the spring. C contract.   Albeit, were a discharge or acquittal to be made known at any time, to all intents & purposes said discharge or acquittal is to be effective on the day of being made known, though removal is to take place in the spring of the year.

"Signed,                     ⎰ AARON HULIN.
                             ⎱ JAMES LEONARDSON."

This contract evidently did not contain the whole of the agreement, and may have been written with a purpose; but the will was in existence, and in the hands of a neighbor, and Leonardson supposed the contract fully secured his rights in connection with said will.   He continued to perform his part of the contract, and received no hint from Hulin that he was thereafter working under any new or different arrangement from the first; and Hulin continued to talk with him and others, as before, that at his death the property would all be Leonardson's.

Hulin was, from the beginning of our acquaintance with him from this record, a very peculiar and eccentric man, full of odd whims and fancies, and egotistical in the extreme.

As he grew older, his eccentricities gained upon him.   He seemed to have a mania for drawing contracts and other instruments relative to his property and his agreement with

Leonardson.   He began to fail in intellect, and Leonardson
and his family were inclined to and did humor him, signing
about everything he wished them to.

Some time in 1878 he drew up some deeds of his property,
in which he conveyed to Eleanor, the wife of the complain-
ant, the Cooley 80 and the Hart 20, known as the homestead,
and some land in Disco and Berlin townships.   He did not
execute the deeds, but exhibited them to complainant
and his wife, and wanted they should sign a new contract
with him, which they did.   What the terms of that contract
were does not fully appear, and it was entered into by com-
plainant and his wife, as they claim, to pacify and please
Hulin, and in the hope that he would deliver the deeds he
showed them.   He never delivered the deeds, however, and
it is not known what became of them afterwards, except that
he told the wife of the complainant that he had destroyed
the one conveying the Berlin property.   Hulin signed his
name to the deeds, but there is no satisfactory proof of there
being any of them acknowledged or witnessed.

About the same time Hulin destroyed the will made in
1860, and executed another, willing his property to the wife
of complainant and two of her sons.   In the same year he
also drew up a will devising his property to Mrs. Yates, a
daughter of Mrs. Hulin.   These wills were shown to some
parties, and Hulin told others that he had drawn them.   It
is not known what became of them, but he probably
destroyed them.

It is manifest from the evidence that he was of unsound
mind, and so enfeebled in intellect that he was not competent
to make any disposition of his property after the year 1877.
He was drawing some kind of a paper, disposing of his prop-
erty, or some part of it, most of the time in 1878 and 1879,
and showing the same, and then destroying it.   He was at
this time about 84 years of age, unable to count money or
transact business intelligently, without help.   He had become

very careless, and even filthy and indecent, in his personal habits, and was in a condition of mind so feeble and erratic as to be easily imposed upon and influenced at times, and again, at times, of his own motion, to make wills and other conveyances which it is evident he would not have drawn if entirely sane and in his right mind. He would draw a paper one moment affecting his property, and the next moment destroy it.

He took offense at some imaginary wrong, and left complainant's house, or his own house, where complainant was living and taking care of him, and went to the house of Adam Yates, in the same neighborhood. The only ill treatment of which he complained upon the part of complainant and his family was shutting the door at one time when he wanted it open, and not sitting up and keeping fire one night when he was sick. The testimony is overwhelming, however, that the complainant and his family treated him with the utmost kindness and respect, and provided everything for his use and comfort that he desired; and they bore with all his eccentricities and petty tyrannies, as well as with his uncleanly acts and habits, as but very few people would have done under like circumstances. It cannot be said that they failed in any respect to carry out cheerfully and in good faith the complainant's part of the contract, and the complainant and his wife uniformly treated him with the same kindness and forbearance that dutiful children would have given an aged and feeble father. And, until his mind was touched and weakened by unsoundness, Hulin was never heard to even hint that he was ill used in the slightest degree, and always bore testimony to their kindness and faithfulness to him.

In 1878 he began corresponding with the defendant Aaron Hulin, 2d, a nephew and namesake of his, who was then living in Kansas, and, after a time, began urging said nephew to come to Michigan and take care of him; promising to ge

rid of complainant, and to give said nephew his property for taking care of him during his life.

In December, 1879, and about the time Hulin, Sr., left complainant, and went to the house of Yates, Hulin, 2d, moved to Michigan, and met his uncle there. Soon after, and at Yates', Hulin, Sr., deeded a portion of his real estate to said Aaron Hulin, 2d, and another portion to one William W. Maxwell, as follows: December 23, 1879, he deeded to Maxwell a piece of land in Shelby, Macomb county, and on the eighth day of January, 1880, he conveyed to Hulin, 2d, 80 acres in Berlin, St. Clair county.

Nothing was paid by either of these parties in consideration for these conveyances, but Hulin, 2d, claims that this land was deeded to him out of kinship, and with an agreement upon his part to support the old man the remainder of his life.

When the complainant learned of these deeds, he filed the original bill in this cause to set them aside, and procured a temporary injunction against the further conveyance of these or any other lands owned by Hulin, Sr. He did not know at the time that the Chesterfield property, upon which he lived, had been deeded, but ascertained, during the progress of the suit, that January 10, 1880, the old gentleman had also conveyed this 100 acres to Hulin, 2d.

After the commencement of suit and issuing of injunction, Aaron Hulin, Sr., returned to live with complainant, and expressed to him and his family great regret that he had made these deeds to Hulin, 2d, and Maxwell. Hulin, 2d, admits in his testimony that during this time the old man requested him to give up the deeds of the Chesterfield property, which he refused to do.

The defendants answered the original bill, and the case was at issue. On the fifth day of May, 1880, the injunction was dissolved, and immediately thereafter, and on the sixth day of that month, Aaron Hulin, Sr., and Aaron Hulin, 2d,

and wife, joined in a quitclaim deed to Thomas H. Bottom-ley, of St. Clair county, and one of the defendants in the supplemental bill. This deed conveyed to Bottomley the Cooley 80 and the Hart 20, upon which Leonardson lived, and another piece of land in Chesterfield.

May 11, 1880, the same parties quitclaimed to said Bottom-ley 40 acres of land on section 8, in Chesterfield.

On the seventeenth day of May, 1880, Aaron Hulin, Sr., executed a quitclaim deed to the defendant Stephen Codding-ton of a piece of land in the village of New Haven, in St. Clair county.

On the twelfth day of May, 1880, he also deeded to Ephraim Coddington 40 acres of land on section 27, in the township of Berlin. Coddington and his wife gave back to Hulin a life-use of this land, which on the twentieth day of December he released to Moses H. Hulin.

May 6, 1880, the defendant William W. Maxwell and his wife quitclaimed to Stephen B. Coddington an undivided one-half interest in the Shelby land deeded to Maxwell by Hulin, Sr.

July 22, 1880, Hulin, Sr., assigned a mortgage of $725 held by him against one Charles Yates to Moses H. Hulin.

Hulin, Sr., died February 14, 1881, without testifying in the suit, but had filed an answer therein. After returning to the house of the complainant from Yates', he only stayed there about two months, and then left the premises for good. He was brought back to the old homestead for burial, and Leonardson paid the expenses of his last sickness and funeral.

About the twenty-fifth of March, 1881, the complainant filed his supplemental bill, making all the parties to these different conveyances defendants; asserting his rights under the contract and agreement hereinbefore stated, and under the will of 1860; alleging the incompetency of Hulin, Sr., to make said conveyances to defendants, and a conspiracy and combination upon their part to take advantage of the

mental weakness of the old man, and to unduly influence him to convey his property to them, and thereby committing a fraud upon him and complainant; alleging that at the time Hulin, Sr., destroyed his will he was incompetent to do so, and that the same had been presented to the probate court of Macomb for probate and allowance as the last will and testament of said deceased, which probate and allowance the defendants were contesting.

The prayer of the supplemental bill is for a decree declaring all the conveyances to the defendants void, and the title to all the lands therein described to have been at the time of Hulin's death in him, subject to the equities of complainant; and that the defendants may be required to consent to the probate of said will; and asking for an injunction against them restraining them from conveying or incumbering any of the real estate, or assigning or foreclosing the Yates mortgage, or from proceeding any further in certain proceedings before a circuit court commissioner instituted to obtain possession of the Chesterfield lands by Bottomley against complainant and his family, or from proceeding in any new action to gain possession of said lands.

The decree of the court below recognized and approved the claim of complainant under his contract, which was found to be as stated in this opinion, and the circuit judge found that the will executed by Hulin in 1860 was destroyed by him in 1878 without the knowledge or consent of complainant; that the defendants, the grantees and assignees in the several conveyances, knew at the date of the same of the contract relations existing between the complainant and Hulin, Sr., and the equitable rights of the former in the property sought to be conveyed by such instruments; that Hulin, at the time of the execution of said instruments to said defendants, "by reason of his great age, mental and physical weakness, was incompetent to do and transact business of that nature and character;" that the complainant has at all times sub-

stantially kept and performed his part of the agreement made in 1845. The conveyances above mentioned are declared void, and a fraud upon Hulin, Sr., and the rights of the complainant; and it is decreed that said Hulin died owning the lands and property, subject to the equitable rights and interests of the complainant therein.

We think this decree is right, as far as it goes, and must be sustained. The incompetency of Hulin is apparent, and must have been known to the defendants. None of them pretend to have parted with any value in consideration of the conveyances, except Bottomley.

Hulin, 2d, Coddington, and Moses Hulin were each to support the old man for the rest of his life. Bottomley was to furnish money and legal aid to defeat the claim of complainant. Bottomley and Hulin, 2d, made the arrangement first, but Bottomley says he was not satisfied with the deed from Hulin, Sr., to Hulin, 2d, because there was a reservation in it. They therefore hunted up the old man, and Bottomley gave him $1,200 for one 40 on condition that he would quitclaim the other parcels to him, thus cutting off the reservation contained in the deed to Hulin, 2d.

All these defendants had ample knowledge of Leonardson's claim and equities.

I am not satisfied that Hulin, Sr., had the mental capacity requisite to destroy the will of 1860, and I do not believe that he fully comprehended what he was doing from 1878 to the time of his death. But we cannot enlarge upon the decree of the court below, as the complainant has not appealed from the same to this Court. That decree simply finds that Leonardson has equitable rights under his contract in the estate of Aaron Hulin, Sr., and that the conveyances to the defendants are void. Here we must leave the controversy, as far as this suit is concerned; and it is now the province of the probate court of Macomb county to determine whether there is any will still existing in law.

That the complainant has rights in the property, or some of it, will or no will, cannot well be disputed.

We think the amendments made to the original and supplemental bills upon the hearing were properly within the discretion of the court.

The decree of the court below is therefore affirmed, with costs.

The other Justices concurred.